UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| Lynn Merrill, Nicholas Giudice, | ) |
| Pauline Lamontagne, Cheryl Peabody, | ) |
| | ) |
| Plaintiffs | ) |
| | ) |
| v. | ) |
| | ) |
| Matthew Dunlap, Secretary of State, | ) |
| in his official capacity; the Maine | ) |
| Department of the Secretary of State; | ) |
| and, in their official capacities, | ) |
| Tracy Roy, Augusta City Clerk | ) |
| & Registrar of Voters; Lisa Goodwin, | ) |
| Bangor City Clerk & Registrar of Voters; | ) |
| Katherine Jones, Portland City Clerk & | ) |
| Registrar of Voters; Lisa Gilliam, Winslow | ) |
| Town Clerk & Registrar of Voters; and | ) |
| the Cities of Augusta, Bangor, Portland | ) |
| and the Town of Winslow, | ) |
| | ) |
| Defendants | ) |

**MOTION FOR A TEMPORARY RESTRAINING ORDER OR, IN THE
ALTERNATIVE, PRELIMINARY INJUNCTION, AND INCORPORATED
MEMORANDUM OF LAW**

Plaintiffs, by their undersigned counsel and pursuant to Fed. R. Civ. P. 65

and 42 U.S.C. 12188(a)(2), move the Court to issue a temporary restraining order

(or, in the alternative, a preliminary injunction) against Defendants, prohibiting

Defendants from violating Title II of the Americans with Disabilities Act

("ADA"), 42 U.S.C. 12011-12213, Section 504 of the Rehabilitation Act ("Section

1

504"), 29 U.S.C. 794, and the Maine Human Rights Act ("MHRA"), 5 M.R.S.A. 4551 et seq., and requiring Defendants to make absentee ballots accessible in time for the November 3, 2020 Presidential Election.

## I.    INTRODUCTION

**"[T]he denial of the right to vote is a denial of a fundamental liberty."**

*Doe v. Rowe*, 156 F.Supp.2d 35, 48 (D. Me. 2001).

The right to vote is fundamental to American democracy. "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Harman v. Forssenius*, 380 U.S. 528, 537 (1965). The right to vote in secrecy is enshrined in the Maine Constitution. Me. Const., Art. II, § 5;  Help America Vote Act of 2002, Pub. L. 107-252 § 301, 116 Stat. 1666, 1704 (codified as amended at 52 U.S.C. 21081) (providing the right to review and change one's ballot private and independently in federal elections).

The absentee ballot system in Maine is inaccessible to blind voters, like Plaintiffs, because it requires them to rely on third parties to complete the paper ballots, depriving them of the right to vote in secrecy that is available to other voters using absentee ballots. This is part of a long history of discriminatory barriers—from inaccessible transportation, to inaccessible polling places, to inaccessible or inoperable voting machines—that people with disabilities,

including blind voters, have had to endure. Consequently, their voter turnout has been lower than the turnout among voters without disabilities.[1] However, this does not reflect a lack of interest in voting. Voter turnout has increased substantially across the country in recent years, as states reduce barriers to voting for people with disabilities.

By denying blind voters equal access to use of the absentee ballot process based on their disabilities, Maine's inaccessible absentee ballot system violates Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12131 *et seq*., and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794(a) *et seq.,* and the Maine Human Rights Act ("MHRA"), 5 M.R.S.A. 4551 *et seq.* These violations have already occurred for the primary election on July 14, 2020 and will continue to be particularly harmful absent immediate relief for the November 3, 2020 general election. Due to the current COVID-19 pandemic, the State of Maine and its municipalities require blind voters to make an unfair choice for the primary election and general election. They must either: a) forfeit their right to vote privately and independently by relying on a third-party to assist them with an inaccessible paper ballot or b) risk their health and the health of their loved ones by traveling to a polling place to cast their vote in

---

[1] Lisa Schur & Douglas Kruse, Fact Sheet: Disability and Voter Turnout in the 2018 Elections, Rutgers School of Management & Labor Relations 5 (May 18, 2020), https://smhr.rutgers.edu/sites/default/files/2018disabilityturnout.pdf

person in the midst of a pandemic. This choice was not necessary. Plaintiffs seek a temporary restraining order ("TRO"), or in the alternative, a preliminary or permanent injunction ("PI") to require Defendants to implement a solution prior to the November 3, 2020 general election to prevent the continuing, immediate, and irreparable harm that blind and visually impaired voters would otherwise suffer.

## II.     <u>PROCEDURAL HISTORY</u>

On July 15, 2020, Plaintiffs Lynn Merrill, Nicholas Giudice, Pauline Lamontagne and Cheryl Peabody filed this lawsuit against Defendants Secretary of State Matthew Dunlap, in his official capacity, the Maine Department of State ("DOS"), the Cities of Augusta, Bangor, Portland and Winslow, the municipalities where Plaintiffs reside, are registered to vote and were denied an accessible absentee ballot, and the Town or City Clerks/Registrars of Voters of each municipality, in their official capacity. ECF No. 1. Plaintiffs file this request for immediate relief because the general election is about 3 ½  months away, Defendant Secretary of State has indicated that there are "no guarantees" for accessible absentee ballots for the general election, the Defendants refused to make absentee ballots accessible to Plaintiffs for the primary election during the pandemic, and Defendants still have provided no plan to ensure that the absentee ballot system will allow Plaintiffs to vote independently and privately by absentee ballot by the Presidential Election on November 3, 2020.

### III.   **STATEMENT OF FACTS**

**A.   COVID-19's Effect on Maine's June 2, 2020 Primary Election And November 3, 2020 Presidential Election**

The effects of COVID-19 on the July 14, 2020 primary election were significant. Nationwide, as of July 13, 2020, there have been 3,296,599 total cases of COVID-19, and 134,884 deaths.[2] COVID-19 poses particular concerns for people with disabilities.[3] Both the Centers for Disease Control and Defendants have encouraged people to use an absentee ballot rather than traveling to polling places.[4] Plaintiffs each requested an accessible absentee ballot from Defendants for both the primary and general election due to concerns about the coronavirus.[5] All requests were denied.[6] There is no sign that the pandemic will abate prior to the general election.

Given the pandemic, it is no surprise that a record number of Mainers have followed the recommendation of their government and requested absentee ballots for the July 14, 2020 primary election. As of 3:00pm on July 10, 2020, 199,290

---

[2] Centers for Disease Control and Prevention, Coronavirus Disease 2019 (COVID-19), Cases in the U.S. (July 13, 2020), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html .

[3] See CDC, People Who Need Extra Precautions: People with Disabilities (May 21, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-disabilities.html .

[4] See https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html  (last visited May 12, 2020); Act 12 Guidance, Guidance on Election Operations During COVID-19 (May 12, 2020),

[5] Ex. A ¶¶  13, 16, 18, 20, 21, 23, 24 (Merrill Decl.); Ex. B ¶¶ 10,11 (Giudice Decl.); Ex. C ¶¶ 11, 13, 15, 16  (Lamontagne Decl.); Ex. D ¶¶ 9, 12 (Peabody Decl.).

[6] Ex. A ¶ 14, 17, 19, 22 (Merrill Decl.); Ex. B ¶¶ 12, 13 (Giudice Decl.); Ex. C ¶¶ 12, 14, 15, 16, 17 (Lamontagne Decl.); Ex. D ¶ 13, 14 (Peabody Decl.).

absentee ballots had been requested in Maine and 198,764 had been issued.[7] In comparison, in the June 2018 primary election, the total requested in Maine was 35,982.[8]  In sum, there were a record number of voters using the absentee ballots for the July 14, 2020 primary, so they do not have to vote in person during the COVID-19 pandemic.  It is reasonable to expect there will be a very substantial number of voters requesting to cast absentee ballots for the general election on November 3, 2020, when the numbers of eligible voters in a Presidential Election year will be that might higher, all in the midst of a pandemic.

### B.    The Absentee Ballot Process in Maine is Inaccessible

Mainers have one option to limit their exposure to others at the polls: an "absentee" ballot. To receive an absentee ballot, a voter must make a request. Although Mainers may apply for an absentee ballot by various means—including an online system administered by the Defendants Sec. Dunlap and the DOS—the result is always the same: if the application is approved, the voter receives a paper ballot, which must be filled out by hand and mailed back to their municipal office.[9]

Blind voters, including Plaintiffs, are unable to complete the absentee paper ballots without assistance from third parties, including because they cannot see to

---

[7] See https://www.maine.gov/sos/cec/elec/data/index.html
[8] See https://www.maine.gov/sos/cec/elec/data/absentee-voter-file61218.txt
[9] See Maine Department of Secretary of State Absentee Voting Guide, at https://www.maine.gov/sos/cec/elec/voter-info/absenteeguide.html

read and mark the paper ballot.  As a result, they cannot vote privately and independently—unlike voters who are not blind.

### C. Defendants Were On Notice Of Maine's Inaccessible Voting Systems and Plaintiffs Requested Reasonable Modification for the Primary and General Election—Accessible Electronic Absentee Ballots--and Were Denied

Plaintiffs and others have placed Defendants on notice that Maine's absentee ballot system must be accessible to voters with disabilities, in compliance with the ADA. Back on September 27, 2019, the National Federation of the Blind emailed a letter to Defendant Sec. Dunlap to "remind you of your obligation, as required by federal law and recent court decisions, to provide voters with print disabilities an accessible way to privately and independently mark an absentee ballot."[10]

The American Council of the Blind (Maine Chapter), in which several of the Plaintiffs belong, emailed a letter to Sec. Dunlap requesting a plan for accessible ballots for voters with disabilities.[11] And Disability Rights Maine also reached out to Sec. Dunlap and requested at least an interim solution prior to the primary election, all to no avail.[12]  To date, Defendants do not have a plan to correct the problem by the general election in November.

---

[10] Ex. G, Ltr. National Federation for the Blind to Sec. Dunlap, September 27, 2019.

[11] Ex. H, Ltr. American Council of the Blind of Maine (ACB) to Sec. Dunlap, June 8, 2020.

[12] Ex. I, Ltr. DRM to Sec. Dunlap, July 2, 2020

In addition, Plaintiffs personally requested reasonable modification from Defendants, namely, to have accessible absentee ballots for the primary and general elections, as well as all future elections.[13] Without exception, Defendants denied their requests.[14] Defendant Sec. Dunlap stated that it would be impossible for them to provide absentee ballots for the July 14, 2020 primary, and there are "no guarantees" that accessible absentee ballots will be available for the general election on November 3, 2020.[15] To date, no online tool for accessible absentee voting for Maine residents exists in any municipality in Maine.

**D.    Viable Solutions for Electronic Absentee Ballots for Blind Voters Exist, Are Commonly Used by Other States And Can Easily Be Fully Operational in Maine for Election Day on November 3, 2020**

Maine does not need to reinvent the wheel to ensure that Plaintiffs will be able to vote by absentee ballot privately and independently on November 3, 2020; viable tools already exist to ensure that Plaintiffs can easily be accommodated with accessible, electronic absentee ballots by the 2020 Presidential Election. Effective options that Maine could adopt to ensure equal access for Plaintiffs include an

---

[13] Ex. A ¶¶ 13, 16, 18, 20, 21, 23, 24 (Merrill Decl.); Ex. B ¶¶ 10,11 (Giudice Decl.); Ex. C ¶¶ 11, 13, 15, 16 (Lamontagne Decl.); Ex. D ¶¶ 9, 12 (Peabody Decl.).

[14] Ex. A ¶ 14, 17, 19, 22 (Merrill Decl.); Ex. B ¶¶ 12, 13 (Giudice Decl.); Ex. C ¶¶ 12, 14, 15, 16, 17 (Lamontagne Decl.); Ex. D ¶ 13, 14 (Peabody Decl.).

[15] Ex. I, Ltr from DRM to Sec. Dunlap, p. 3, July 2, 2020

accessible ballot in PDF format and customized ballot marking software or an absentee balloting system.[16]

First, given its obligations under the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), Maine has a process in place for a decade that allows ballots to be delivered and received via email in PDF format.[17] That PDF can be made accessible and fillable in a matter of minutes, so that blind people using screen reader technology can mark the ballot in secrecy without involving third-parties and return it by email.  For making a ballot accessible, the State of Maine only needs a word processor, Adobe Acrobat Pro software, and training for election officials.[18]  The technology that would enable Defendants to modify their absentee voting systems such that blind individuals could vote privately and independently is both available to Defendants and easy to use.

Second, Maine could implement customized ballot marking software or an absentee balloting system as a comprehensive system for ballot delivery, voting,

---

[16] Ex. E, ¶ 6 (Dr. Lazar Decl.) (discussing three ballot types, including blank accessible PDF, accessible ballot in PDF format and customized ballot marking software; the first option, blank accessible PDF, does not provide equivalent experience, see ¶¶ 7-9, and is not discussed here).

[17] See Department of Secretary of State, Frequently Asked Questions: Uniformed Service & Overseas (UOCAVA) Voters, at file:///M:/Litigation/Users/Kristin/1%20-%20Cases%20open/Blind%20voters%20-%20Acessible%20Absentee%20Ballot/Research/EM%20Research/Maine%20UOCAVA%20faq.pdf

[18] Ex. E, Decl. Dr. Lazar ¶¶ 10-12.

and return of ballots.[19]   These systems are also an excellent solution for easy delivery, voting and return of the ballot. These tools are tested and in use by other states, including for example, Maryland, West Virginia and Delaware.[20] Maine has tested options to choose from, all of which can be implemented in 3 ½ months, and they can be implemented with relative ease.[21]

### E.    Plaintiffs Merrill, Giudice, Lamontagne and Peabody

Plaintiffs are blind or have abnormal vision loss, and they want to vote independently by absentee ballot in the general election. They are registered Maine voters who normally have gone to the polls to cast their vote. But this year, they will not go to the polls to vote because of the increased risk of COVID-19.  Three of the four plaintiffs have underlying health conditions that put them or their loved ones at increased risk if they travel to the polls and vote in person.[22] Traveling to, and going to the polls would risk their health.  If Defendants fail to provide an accessible absentee ballot for the November 3, 2020 general election, as they did for the primary election on July 14, 2020, then the Plaintiffs will again have to "either risk [their] health by going to the polls or forfeit [their] privacy by having someone else complete [their] absentee ballot for [them].[23]   For some, this will meant that they just will not vote on November 3, 2020. Indeed, three of the four

---

[19] Ex. E, ¶ 13-16 (Dr. Lazar Decl.)
[20] *Id.* at ¶15 (Dr. Lazar Decl.)
[21] *Id.* at p. 12 (Dr. Lazar Decl.)
[22] Ex. A ¶ 13 (Merrill Decl.); Ex. C ¶ 11 (Lamontagne Decl.), Ex. D ¶ 9 (Peabody Decl.).
[23] Ex. A ¶ 14 (Merrill Decl.).

Plaintiffs did not vote in the primary and special referendum elections on July 14, 2020, after Defendants denied their requests for accessible absentee ballots.[24]  Ms. Lamontagne, an accomplished retired attorney who is blind, did vote, but she had to locate someone to assist her because her only option was a paper absentee ballot; her husband could not assist because he is blind as well.[25]  Exercising one's most fundamental civil right in a democracy—voting—should not depend on the kindness of strangers. But for Ms. Lamontagne, and many others with print disabilities, it does.

## IV.   STATEMENT OF THE QUESTION INVOLVED

Are Plaintiffs entitled to a TRO or, alternatively, a preliminary injunction so they can vote at the November 3, 2020 general election?

*Suggested answer:  yes.*

## V.   ARGUMENT

### A.   Plaintiffs Have A Likelihood of Success on the Merits Because Defendants Discriminate Against Plaintiffs in Violation of the ADA, Section 504 and the MHRA.

Four factors govern a court's decision whether to issue a preliminary injunction: (1) whether the movant will suffer irreparable harm if the injunction is denied; (2) whether such injury outweighs any harm which granting injunctive relief would inflict upon the non-movant; (3) whether the movant has exhibited a

---

[24] Ex. A ¶ 14 (Merrill Decl.), Ex. D ¶ 20  (Peabody Decl.).
[25] Ex. 17 ¶ 17 (Lamontagne Decl.).

likelihood of success on the merits; and (4) whether the public interest will not be adversely affected by the granting of the injunction.  See *Waldron v. George Weston Bakeries*, 570 F.3d 5, 9 (1st Cir. 2009); *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 5 (1st Cir. 1991); and *Planned Parenthood of Mass. v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir. 1981).  The same standards apply to the grant of a temporary restraining order.  See *In re Northeast Exp. Regional Airlines, Inc.,* 169 B.R. 258, 259-60 (Bkrtcy.D.Me. 1994).  "The party seeking the preliminary injunction bears the burden of establishing that these four factors weigh in its favor."  *Esso Standard Oil Co. (Puerto Rico) v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006).

Whether to issue a preliminary injunction depends on balancing equities where the requisite showing for each of the four factors turns, in part, on the strength of the others.  *Concrete Machinery Co. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 611-13 (1st Cir. 1988). "[T]he sine qua non of [the preliminary injunction standard] is whether the plaintiffs are likely to succeed on the merits . . ." *Gately v. Massachusetts,* 2 F.3d 1221 (1st Cir. 1993).  Given the importance of the third factor and the great weight given to it relative to the other factors, Plaintiffs will first address the likelihood of success on the merits, followed by irreparable injury, the balance of the equities, and the public interest.

To prevail on a discrimination claim under either Title II, Section 504 or the MHRA, a plaintiff must establish that he (1) has a disability, (2) is otherwise qualified to participate in the service, programs, or activity of the public entity, and (3) is being denied the benefits of the service, program, or activity or is otherwise subject to discrimination because of his disability. *Chambers ex rel. Chambers v. Sch. Dist. of Philadelphia Bd. of Educ.*, 587 F.3d 176, 189 (3d Cir. 2009); Parker v. Universidad de Puerto Rico, 225 F.3d 1, 5 (1st Cir. 2000).[26]

### B.    Plaintiffs Are People with Disabilities and Are Registered to Vote

Because Plaintiffs are blind or have abnormal vision loss and registered to vote in Maine, they are "qualified individual[s]" with a disability.[27] See 42 U.S.C. §§ 12102(1), 12131(2); 29 U.S.C. § 705(20)(B). Maine's system of voting by absentee ballot constitutes a service, program, or activity under the ADA—indeed,

---

[26] Section 504 of the Rehabilitation Act is generally co-extensive with Title II of the ADA and construed consistently.  See *Parker v. Universidad de Puerto Rico*, 225 F.3d 1, 4 (1st Cir. 2000); *Theriault v. Flynn*, 162 F.3d 46, 48 (1st Cir. 1998). The Maine Law Court "has relied on federal case law construing the federal anti-discrimination statutes as an aid to interpretation of similar provisions in our own Maine Human Rights Act." *Maine Human Rights Comm'n v. City of Auburn*, 408 A.2d 1253, 1261 (Me.1979); *Scamman v. Shaw's Supermarkets, Inc.,* No. 2:15-CV-00295-JDL, 2016 WL 1366758, at *11 (D. Me. Jan. 26, 2016). The only additional element for a Section 504 claim is that the defendant must receive federal funding. 29 U.S.C. § 794(a). DOS and Maine's municipalities receive federal funds to help administer its elections, including $3,512,764 in federal Help American Vote Act, 52 U.S.C. § 20901 et seq ("HAVA") funds (https://www.eac.gov/payments-and-grants/2020-hava-funds ) and $3,299,827 in HAVA emergency funds under the Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No, 116-136 (2020) (CARES Act) (https://www.eac.gov/payments-and-grants/2020-cares-act-grants), in 2020, for the purpose of conducting elections safely during the pandemic.  Plaintiffs' references to the "ADA" in this Brief include the ADA, Section 504 and the MHRA.

[27] Ex. A ¶¶ 4, 5 (Merrill Decl.); Ex. B ¶¶ 3, 4 (Giudice Decl.); Ex. C ¶¶ 4, 5 (Lamontagne Decl.); Ex. D ¶¶ 3, 4 (Peabody Decl.).

ADA requirements apply broadly to almost "anything a public entity does." *Yeskey v. Pennsylvania Dep't of Corr.*, 118 F.3d 168, 171 & n.5 (3d Cir. 1997).

### C. Defendants Discriminate Against Plaintiffs By Failing to Provide an Accessible Absentee Ballot for Blind People

Title II of the ADA prohibits Defendants from administering its absentee voting systems in a manner that excludes qualified individuals with disabilities, including Plaintiffs, from participating in or denying them the benefit of their programs, services, or activities or otherwise subjecting them to discrimination.  42 U.S.C. § 12132.  The broad spectrum of unlawful "discrimination" under the ADA includes;  (1) denying people with disabilities an opportunity to participate in the state's benefits and services that is not equal to that afforded others; (2) providing people with disabilities with a service that is not as effective in affording equal opportunity to obtain the same result, gain the same benefit, or reach the same level of achievement as that afforded to others; (3) the failure to make reasonable modifications to policies, practices, and procedures when necessary to afford people with disabilities equal access to the state's services, programs, and activities; and (4) the failure to assure effective communication with people with disabilities, including the failure to provide auxiliary aids and services, including accessible electronic and information technology. 28 U.S.C. §§ 35.130(b)(1)(ii),

35.130(b)(1)(iii), 35.130(b)(7)(i), 35.160.[28] Plaintiffs each requested reasonable modification, or an alternative to the paper ballot that is not accessible to them, for the primary and general elections.[29] Defendants Sec. Dunlap, DOS, City and Town Clerks Roy, Goodwin, Jones and Gilliam, and Bangor, Augusta, Portland and Winslow all, without exception, denied the Plaintiffs' requests for reasonable modification.[30]  By relying on paper absentee ballots, Defendants violate the ADA. Paper ballots deny voters with visual disabilities equal access to the absentee voting processes.   Completion of paper ballots requires voters with visual disabilities to have assistance – they must ask someone to read the ballot and complete it for them.   Unlike voters who do not have visual disabilities, they cannot vote in secrecy and their privacy is violated.  Such a system denies blind voters equal opportunity to participate in the absentee voting process and affords them a service that is not as effective as that provided to non-blind voters. Moreover, DOS's failure to provide an online, accessible voting system, such as the UOCAVA system, which would be an appropriate accessible solution, violates

---

[28] The purpose of the auxiliary aid and service requirement is to ensure that the person with a disability has equal opportunity to benefit and participate in the program. Defendants fail to provide Plaintiffs with the equal opportunity to vote by absentee and mail-in ballot privately and independently. See *National Federation of the Blind. v. Lamone*, 813 F.3d 494 (4th Cir. 2016).

[29] Ex. A ¶¶  13, 16, 18, 20, 21, 23, 24 (Merrill Decl.); Ex. B ¶¶ 10,11 (Giudice Decl.); Ex. C ¶¶ 11, 13, 15, 16  (Lamontagne Decl.); Ex. D ¶¶ 9, 12 (Peabody Decl.).

[30] Ex. A ¶ 14, 17, 19, 22 (Merrill Decl.); Ex. B ¶¶ 12, 13 (Giudice Decl.); Ex. C ¶¶ 12, 14, 15, 16, 17 (Lamontagne Decl.); Ex. D ¶ 13, 14 (Peabody Decl.).

the ADA's reasonable modification and effective communication and auxiliary aids and services mandates.

In *National Federation of the Blind v. Lamone,* 813 F.3d 494 (4th Cir. 2016), the Fourth Circuit held that Maryland election officials violated Title II of the ADA and Section 504 of the RA by relying exclusively on paper ballots in its absentee ballot process.  Affirming the district court's finding that voters with visual disabilities cannot mark their paper ballots without assistance, unlike voters without such disabilities, the court determined that "[t]his sharp disparity makes obvious that defendants have provided 'an aid, benefit, or service [to disabled individuals] that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others.'"  *Id.* at 506 (citations omitted).  The court concluded:

> Voting is a quintessential public activity.  In enacting the ADA, Congress explicitly found that "'individuals with disabilities … have been … relegated to a position of political powerlessness in our society, based on characteristics that are beyond the control of such individuals.'" *Tennessee v. Lane*, 541 U.S. 509, 516, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004) (quoting 42 U.S.C. § 12101(a)(7) [and citing *Doe v. Rowe*, 156 F.Supp.2d 35, 48 (D. Me. 2001)].  Ensuring that disabled individuals are afforded an opportunity to participate in voting that is equal to that afforded others, 28 C.F.R. § 35.130, helps ensure that those individuals are never relegated to a position of political powerlessness. *We affirm the district court's conclusion that by effectively requiring disabled individuals to rely on the assistance of others to vote absentee, defendants have not provided*

16

> plaintiffs with meaningful access to Maryland's absentee
> voting program.

*Id.* at 507 (emphasis added).

The law does not permit Defendants to require that disabled individuals rely upon the kindness, availability, and accuracy of nondisabled third parties to assist them in filling out their absentee ballots. *See, e.g.*, *American Council of the Blind v. Paulson*, 525 F.3d 1256, 1264 (D.C. Cir. 2008) (While "[t]here was a time when disabled people had no choice but to ask for help – to rely on the kindness of strangers[,] … [i]t can no longer be successfully argued that a blind person has meaningful access to currency if she cannot accurately identify paper money without assistance.") (alterations in original).

### D. It Would Not Be a Fundamental Alteration for Defendants to Implement An Accessible PDF Ballot or Custom Ballot Marking Software/Absentee Balloting System in Time For the November 3, 2020 Presidential Election

While Defendants are not required to make reasonable modifications or provide auxiliary aids and services if doing so would result in a fundamental alteration of its voting system, 28 C.F.R. § 35.164; 28 C.F.R. § 35.130(b)(7)(i), Defendants would bear the burden of proving this affirmative defense, and other courts have rejected it. *See, e,g, Lamone*, 813 F.3d at 509–10. Here, Defendants could not make such a showing. Defendants may cure the discrimination inherent in Maine's absentee systems through auxiliary aids and services that would not

fundamentally alter the nature of these programs. Clearly, tested systems already exist in other states that Maine could choose from, and in addition, the UOCAVA ballot system already exists in Maine and it can be made accessible in days, so that the blind can vote by absentee ballots in privacy – like other voters – for the November 3, 2020 general election.[31]

### 1.    Plaintiffs Are At Imminent Risk of Further Irreparable Harm

Plaintiffs also will likely establish that, absent a TRO for the short term (i.e., the November 3, 2020 primary election), they are at imminent risk of suffering irreparable harm. "Irreparable harm is an actual, imminent injury that cannot be adequately remedied by an award of monetary damages. *International Dairy Foods Ass'n v. Amestoy,* 92 F.3d 67, 71 (2d Cir. 1996). Irreparable harm occurs when a disabled person is barred from participating in a normal life activity by virtue of ongoing discrimination related to his disability. See *D'Amico*, 813 F. Supp. at 220 (finding irreparable harm where failure to make accommodation on bar exam would deny candidate "equal opportunity to be admitted to the practice of law").

"[W]hen the likelihood of success on the merits is great, a movant can show somewhat less in the way of irreparable harm and still garner preliminary injunctive relief." *E.E.O.C. v. Astra U.S.A., Inc.,* 94 F.3d 738, 743 (1st Cir. 1996).

---

[31] See Ex. E, Decl. of Dr. Lazar

"It is usually enough if the plaintiff shows that its legal remedies are inadequate.  If the plaintiff suffers a substantial injury that is not accurately measurable or adequately compensable by money damages, irreparable harm is natural sequel." *Ross-Simons of Warwick, Inc., v. Baccarat, Inc*., 102 F.3d 12, 18-19 (1st Cir. 1996) (internal citations omitted).

Absent an injunction, Plaintiffs will be forced either to risk their health and their loved ones' health by traveling to a polling place on election day, which no other citizens of Maine will have to do, or forfeit their right to vote privately and independently in the General election by seeking assistance with an absentee ballot. Infringement of voting rights "cannot be alleviated after the election" and thus constitutes irreparable harm. See *Council of Alternative Political Parties v. Hooks,* 121 F.3d 876, 883 (3d Cir. 1997); *Marks v. Stinson*, 1994 WL 47710, at *14 (E.D. Pa. Feb. 18, 1994), vacated in part, 19 F.3d 873 (3d Cir. 1994) ("Plaintiffs . . . suffer irreparable harm when a state representative is not properly elected.").

Here, as in *Lamone*, because Plaintiffs "are being deprived of their right to vote by absentee ballot privately and independently," the "[r]emedies available at law are inadequate to compensate [them] for [this] violation."  *Nat'l Fed'n of the Blind, Inc. v. Lamone*, 2014 WL 4388342, at *15 (D. Md. Sept. 4, 2014) , aff'd sub nom. *Nat'l Fed'n of the Blind v. Lamone,* 813 F.3d 494 (4th Cir. 2016).

### 2.      A TRO Will Not Harm Defendants but will Advance the Public Interest by Promoting Voting Rights and Safeguarding Health

The final two factors—the "possibility of harm to other interested persons from the grant or denial of the injunction" and "the public interest"—also cut sharply in favor of Plaintiffs. With respect to the former, "voting is of the most fundamental significance under our constitutional structure," *Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979).

Absent an injunction, Plaintiffs' voting rights will be impinged, because they will not be able to fill out an absentee ballot privately and independently—or else Plaintiffs will be forced to risk their health in order to exercise the franchise.

While the harm to Plaintiffs in the absence of an injunction would be great, any harm caused to Defendants by the issuance of an injunction would be negligible if not completely nonexistent.   Plaintiffs face serious continuing harm as the result of the Defendants' failure to provide modification.  On the other hand, complying with the requirements of federal law cannot harm Defendants.   The Seventh Circuit has summed up this rationale as follows:

> Because the defendants are required to comply with the [law in question], we do not see how enforcing compliance imposes any burden on them.  The Act itself imposes the burden; this injunction merely seeks to prevent the defendant from shirking their responsibilities under it.

*Haskins v. Stanton,* 794 F.2d 1273, 1277 (7th Cir. 1986).

By contrast, adoption of UOCAVA solution will impose minimal costs on Defendants. Michigan recently agreed to use the UOCAVA solution for its primary.   On May 1, 2020, a few days after blind voters filed an ADA and Section 504 lawsuit challenging the inaccessibility of its absentee ballot process, Michigan entered into a Stipulation and Consent Order, which the court approved, to make its UOCAVA program available to disabled voters for the May 5, 2020 election. Michigan had four days to implement this change. Michigan already had the technology available, and successfully provided the plaintiffs and other voters with disabilities access to an accessible absentee ballot in advance of the May 5, 2020 election. On May 19, 2020, the Michigan court approved a consent decree requiring Michigan to adopt an accessible online ballot marking tool in time for its August and November 2020 elections.

With respect to the public interest, the public has a "strong interest in exercising the fundamental political right' to vote"—meaning that "[t]he public interests therefore favors permitting as many qualified voters to vote as possible." *Obama for Am. v. Husted*, 697 F.3d 423, 436–37 (6th Cir. 2012). A TRO also would enable more citizens to stay at home on Election Day and promote the public health in compliance with state and federal guidance.

When Congress enacted the ADA, it specifically indicated the eradication of discrimination on the basis of disability to be in the public interest, in part, to avoid

the heavy dependency and non-productivity costs flowing from "unfair and unnecessary discrimination and prejudice."   42 U.S.C. 12101(a)(9);   see also *Tennessee v. Lane,* 541 U.S. 509, 516 (2004) ("[T]he ADA is designed 'to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.") (quoting 42 U.S.C. 12101(b)(1)).  It follows that a preliminary injunction serves the public interest when it prevents the discrimination Congress sought to outlaw by passing the ADA.  See, e.g., *Agranoff*, 97 F.Supp. 2d at 88 ("[T]he court has an obvious public interest in providing those with disabilities equal footing.").

### 3.  The Court Should Waive Bond

 A party seeking a preliminary injunction may be required to post a bond or other form of security to the extent the Court "considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed.R.Civ.P. 65.  Courts have waived the bond requirement under a variety of circumstances:   where the plaintiffs, proceeding individually or as a class, are indigent; where the litigation involves an important "public interest," and where the plaintiffs have demonstrated a strong likelihood of success on the merits. 11A C. Wright & A. Miller, Federal Practice & Procedure § 2954 (2d ed. 2010); see also *Maine Ass'n of Interdependent Neighborhoods v. Petit*, 647 F.Supp. 1312, 1319 (D. Me. 1986) ("[T]he Court may waive the security requirement where the

party seeking injunctive relief has shown an extraordinarily high likelihood of success on the merits."). Here, a bond requirement would impose a significant hardship on Plaintiffs, and this suit is about voting—a federal right. Accordingly, bond should be waived.

## VI.   CONCLUSION

For the foregoing reasons, this Court should issue a temporary restraining order, or, in the alternative, a preliminary injunction, to require Defendants to make the absentee ballot process accessible and available to Plaintiffs and other blind voters for the November 3, 2020 general election and to notify voters on Defendants' website of the changes.

Dated: July 15, 2020

/s/ *Kristin L. Aiello*
Kristin L. Aiello, ME Bar No. 8071
Attorney for Plaintiffs
DISABILITY RIGHTS MAINE
160 Capitol Street, Suite 4
Augusta, Maine 04330
(207) 626-2774

## CERTIFICATE OF SERVICE

I, Kristin L. Aiello, hereby certify that the Plaintiffs' Complaint, Memorandum of Law in Support of Plaintiffs' Motion for a Temporary Restraining Order, Or in the Alternative, Preliminary Injunction, was served by email on July 15, 2020 and by mail on July 15, 2020:

**State of Maine Department of the Secretary of State**
Aaron Frey
Attorney General
Office of the Maine Attorney General
109 Sewall Street
Augusta, Maine 04330
aaron.frey@maine.gov

**Matthew Dunlap, Secretary of State**, **in his official capacity**
Secretary of State Matthew Dunlap
Office of the Secretary of State
148 State House Station
Augusta, Maine 04333-0148
Tel: 207-626-8400
sos.office@maine.gov

**Tracy Roy, City Clerk and Registrar of Voters, in her official capacity**
Tracy Roy City Clerk and Registrar of Voters
City of Augusta
16 Cony Street
Augusta, Maine 04330
tracy.roy@augustamaine.gov

**City of Augusta, Maine**
Tracy Roy, City Clerk
City of Augusta
16 Cony Street
Augusta, Maine 04330
tracy.roy@augustamaine.gov

**Lisa Goodwin, City Clerk and Registrar of Voters, in her official capacity**
Lisa Goodwin, City Clerk
City of Bangor
73 Harlow Street
Bangor, Maine 04401
207.992.4200
lisa.goodwin@bangormaine.gov
cityclerk@bangormaine.gov


**City of Bangor, Maine**
Lisa Goodwin, City Clerk
73 Harlow Street
Bangor, Maine 04401
207.992.4200
lisa.goodwin@bangormaine.gov
cityclerk@bangormaine.gov

**Katherine Jones, City Clerk and Registrar of Voters, in her official capacity**
Katherine Jones, City Clerk
City of Portland
389 Congress Street
Portland, Maine 04101
cityclerk@portlandmaine.gov
klj@portlandmaine.gov

**City of Portland, Maine**
Katherine Jones, City Clerk
City of Portland
389 Congress Street
Portland, Maine 04101
cityclerk@portlandmaine.gov
klj@portlandmaine.gov


**Lisa Gilliam, Town Clerk and Registrar of Voters, in her official capacity**
Lisa Gilliam, Town Clerk
Town of Winslow
114 Benton Avenue
Winslow, Maine 04901

gilliam@winslow-me.gov

**Town of Winslow, Maine**
Lisa Gilliam, Town Clerk
Town of Winslow
114 Benton Avenue
Winslow, Maine 04901
gilliam@winslow-me.gov

DATED: July 15, 2020                    */s/ Kristin L. Aiello*_____
                                        Kristin L. Aiello, ME Bar No. 8071
                                        Disability Rights Maine
                                        160 Capitol Street, Suite 160
                                        Augusta, Maine 04330
                                        (207) 626-2774, ext. 223
                                        kaiello@drme.org

                                        Counsel for Plaintiffs